## Case No. 548.

### ARMSTRONG v. UNITED STATES.

[Gilp. 399.][1]

District Court, E. D. Pennsylvania. May Sessions, 1833.

OFFICE AND OFFICERS — NAVY AGENT —APPOINTMENT — SETTLEMENT OF ACCOUNTS — EXPENSES AND COMMISSIONS—WARRANT OF DISTRESS.

1. A warrant of distress. under the provisions of the act of 15th May, 1820, [3 Stat. 592,] has the effect of a judgment.

2. The bill of complaint of a debtor, against whom a warrant of distress has been issued, under the provisions of the act of 15th May, 1820, is in the nature of a motion to stay execution on a judgment, and the beginning and conclusion of the argument are with the debtor.

3. A permanent agent is one appointed by the president, with the advice and consent of the senate, in contradistinction to one specially appointed by the head of a department, for some particular service. and on terms agreed upon.

[Cited in Strong v. U. S., 6 Wall. (73 U. S.) 789.]

4. A permanent agent commissioned under the act of 3d March, 1809, is entitled to no more than a commission of one per cent. on the moneys disbursed by him for the use of the United States, and also on the value of stores furnished by the United States, and distributed though not purchased by him.

5. In the act of 3d March, 1809, [2 Stat. 535,] there is no distinction between foreign and domestic agents, as to either the mode of appointment, the tenure and permanency of their offices, or the terms on which they may receive them.

6. A navy agent stationed abroad, who has been removed. or whose office has been vacated, cannot charge the government with his return home,. nor with his travelling expenses in going to the seat of government to settle his accounts.

7. Where an article is furnished by a navy agent, and expressly received and accepted by the United States for the public use. he is entitled to a credit for its value. although the article is not one which an agent is authorised to purchase on public account.

8. Where a bill of exchange, properly drawn by an authorised agent on the head of a department, is permitted by him to be protested for non-acceptance and non-payment. under a mistake of a fact concerning it, the agent is entitled to a credit for the damages paid by him in consequence of the protest.

On the 30th July, 1832, the solicitor of the treasury, according to the provisions of the second and third sections of the act of 15th May, 1820, issued a warrant of distress against the complainant Andrew Armstrong and his surety, directed to the marshal of the eastern district of Pennsylvania, specifying the sum of twelve thousand nine hundred and forty-nine dollars and sixty-three cents, as the amount with which the said Andrew Armstrong was chargeable, for public moneys received by him and not paid over according to law. 3 Story's Laws, 1791, [3 Stat. 592.] On the 1st August, the marshal. in pursuance of this warrant. made a levy on the person of Mr. Armstrong and on the goods and chattels of his surety. On the 3d August, the complainant, alleging that he was aggrieved by these summary proceedings, and not only denying that he was chargeable with the amount stated in the warrant, but claiming the sum of four thousand six hundred and eighty-one dollars and seventy-four cents, as actually due to him from the United States, over and above all moneys received, preferred a bill of complaint to the district judge of the United States for this district, setting forth the injury thus done to him, and praying the judge to grant an injunction to stay proceedings on the warrant altogether. On the same day, the judge being satisfied that the application was not merely for the purpose of delay, and the complainant having given bond, with approved surety, conditioned for the performance of such judgment as should be ultimately awarded against him, an injunction was granted to stay proceedings on the warrant of distress; and a subpoena issued to the solicitor of the treasury to appear and answer on behalf of the United States. On the 5th October, the attorney of the United States for this district filed an answer on their behalf, as well in regard to the matters of fact stated by the complainant, as to his claims alleged to be derived under certain acts of congress and established usages of the government. On the 12th October, he further prayed the court to dissolve the injunction altogether, and to permit the United States to pursue their legal remedies for the recovery of the whole sum of money demanded by them from the complainant.

On these pleadings the case came to be heard before the district court, on the 24th June, 1833, when the material facts established were as follows: Andrew Armstrong was appointed by the president, by and with the advice and consent of the senate, navy agent for the port of Lima, in Peru, in South America. His commission was dated on the 24th April, 1828, and was to continue in force during the term of four years from that day. From a conversation shortly afterwards with Mr. Charles Hay, at the time chief clerk of the navy department, he derived the belief that all navy agents, at foreign ports, were allowed the customary commercial commissions of their respective stations, as had been especially done in the cases of Michael Hogan, navy agent at Valparaiso, and Richard M'Call, navy agent to supply the Mediterranean squadron. On the 16th January,. 1829, he received written instructions from the secretary of the navy, relative to the duties of his office, instructing him to supply the necessary stores and to draw on the department for the requisite funds; he was. also directed to furnish accounts and vouchers regularly on the first days of January,.

[Reported by Henry D. Gilpin, Esq.]

April, July, and October, and referred to the act of congress of the 3d March, 1809, as that by which he was to be governed in the keeping and settlement of his accounts. He left the United States, and commenced the duties of his office at Lima, on the 1st July, 1829; and continued to exercise them until superseded in the following year. On the 5th April, 1830, the secretary of the navy informed him by letter, that the president had revoked his commission, it being considered more for the benefit of the public service, that the duties of a navy agent on that coast, should be performed by a purser specially appointed for the purpose. This letter reached Mr. Armstrong at Lima, on the 20th October; and he was informed also that his successor was Mr. Philo White. Commodore Thompson, then commanding the squadron on the station, requested Mr. Armstrong to continue to perform the duties of the office until the arrival of Mr. White, which he did up to the 1st June, 1831, when that person received from him all the stores in his possession. He continued, however, to reside at Lima until the 20th January, 1832, when he went to Valparaiso; there he embarked on the 9th March, and arrived in the United States in the month of June following. He repaired to Washington and exhibited his accounts, claiming a balance to be due to him from the United States, of four thousand six hundred and eighty-one dollars and seventy-four cents. In his account, as settled by the accounting officers of the treasury, on the 14th July, they certified, on the contrary, a balance of twelve thousand nine hundred and forty-nine dollars and sixty-three cents to be due by him. This difference, amounting altogether to seventeen thousand six hundred and thirty-one dollars and thirty-seven cents, constitutes the subject of the present controversy. It consists of the following charges, made by Mr. Armstrong, which were rejected by the accounting officers of the treasury. 1. The sum of five thousand seven hundred and fifty-five dollars and eighty-six cents. and also of four dollars, being four per cent. commission on all the disbursements made by Mr. Armstrong; one per cent. was allowed him according to the act of 3d March, 1809, but he claimed five per cent. as "the customary commercial commission of the station." 2. The sum of ten hundred and forty-three dollars and ninety-nine cents, being five per cent. on the value of the stores distributed by him, and claimed on the same ground. 3. The sum of one hundred and eighty-three dollars and twenty-four cents. five per cent. on the value of the stores delivered over by him to his successor in office, Mr. Philo White, claimed on the same ground. 4. The sum of two hundred and sixty-eight dollars and seventy-five cents, charged for the hire of a clerk, over and above the sum allowed by the department, and claimed on the ground that it had actually been paid in the necessary service

of the United States. 5. The sum of eight hundred and sixty-three dollars and thirty-three cents, for damages paid on a bill drawn by Mr. Armstrong on the secretary of the treasury, but protested by him, and claimed on the ground that the bill was properly drawn, while the refusal to accept arose from a mistake made by the officers of the United States, without any fault of his. 6. The sums of sixteen hundred and nine dollars and eighty-seven cents, and three thousand two hundred and twenty-nine dollars and fifteen cents, making together, four thousand eight hundred and thirty-nine dollars and two cents, for board and compensation, from the time he was superseded until he left Lima, claimed on the ground that he was detained on account of the protest of his bill, and also to fulfill the duties of the office until his successor arrived. 7. The sums of three hundred and fifty dollars, and forty-three dollars and fifty cents, making together three hundred and ninety-three dollars and fifty cents, for the cost of his passage to the United States and his journey to Washington, claimed on the ground of his sudden and unexpected recall, without the least alleged misconduct on his part. 8. The sum of four thousand two hundred and seventy-nine dollars and sixty-eight cents for tobacco furnished and actually delivered by him to the agent of the United States, for the use of the squadron.

At the outset, a question arose between counsel, as to which party belonged the right to commence and conclude the argument. It was claimed by the attorney of the United States, on the ground that this stage of the proceeding was, in fact, the trial of the issue between the United States and the debtor, the ascertainment of the sum due, in which the affirmative rested with them, while the debtor was to disprove their claim in whole or in part. The counsel for the complainant contended that this was, by the very terms of the law, a prayer for relief by him; that he was to show the injury he had sustained; and that he was exactly in the situation of a party against whom a judgment exists, making application to a court to open it and set it aside in whole or in part.

On this preliminary point, HOPKINSON, District Judge, delivered the following opinion: The right to begin and conclude is with the complainant. By the act of congress of 15th May, 1820, [3 Stat. 592,] on the certificate of a balance due being given by the comptroller of the treasury, the United States may issue their warrant of distress, which is, in fact, an execution and levy for the amount certified on the person, goods, and lands of the debtor. It has then all the effect of a judgment, and the party indebted must get rid of it, by showing that none or a portion only of the sum is due. When a motion is made to stay proceedings

or an execution, on a judgment entered, and to let the party into a defence, the beginning and conclusion are with the defendant. The district attorney has nothing to show but his warrant of distress, which is prima facie evidence of the debt, and is already in' possession of the court, being in the hands of its officer. The question before the court relates only to the continuance or removal of this warrant; not to the final settlement of the debt or balance between the parties. It is incumbent on the complainant to show that there are sufficient grounds for its removal in whole or, in part. In this he is the actor.

The case was then argued by Dallas and J. R. Ingersoll for complainant, and Gilpin, Dist. Atty., for United States.

Dallas, for the complainant.

Mr. Armstrong was commissioned by the president, as a navy agent, from the 24th April, 1828, for a period of four years, but his appointment was revoked, and he received notice of it on the 20th October, 1830. In settling his accounts after his return home, a difference arose between him and the treasury; as to the items and amount of this difference there is no dispute; it is only as to the legality or equity of his claims. The first ground taken against him is, that he is entitled but to one per cent. on his disbursements, instead of five per cent. the customary commercial commission at Lima. It is assumed at the outset that he was appointed "a permanent navy agent" under the act of 3d March, 1809, [2 Stat. 535,] which limits his compensation to one per cent. on the public moneys disbursed by him. He was not, however, appointed under that law, nor is he subject to its provisions. He was appointed "a foreign and special agent," and as such was entitled to charge and receive the customary commission of five per cent. 1. As to the first position, that he was not appointed under the act of 1809. There are two sorts of navy agencies known to the laws of the United States, which vary substantially; those at Gibraltar, Valparaiso, London, Marseilles, and St. Thomas are confessedly different from those at Philadelphia, New York, and elsewhere in the United States. This difference arises not from any diversity in the mode of appointment; it may be in any case, whether at home or abroad, either by commission or special authority. Nor does it arise from the circumstances of one being, and the other not being, expressly established by law; the establishment of both or neither may be by law; it is well known that there are various modes of constituting officers who are not expressly appointed by a particular statute, but who are recognised by the government and by the courts as equally legal, and who are bound to perform their duties, and entitled to their com-

pensation; there is, in fact, no law whatever, establishing any navy agencies, permanent or special, foreign or domestic. Nor does it arise from any difference in the duration of the office; in this case a distinction has been set up between such as are permanent and such as are temporary, but both are equally dependent on the discretion of the executive; we here see the navy agency of Mr. Armstrong, at Lima, called permanent, which expired in fifteen months; and that of Mr. M'Call, at Gibraltar, called temporary or special, which lasted for fifteen years. No. The real difference arises out of the nature of things. One class is foreign and the other domestic; Lima is like Gibraltar, and the act of 1809 can apply neither to one nor the other; it evidently refers only to a domestic agent, it requires him to keep the public money in some incorporated bank, it obliges him to settle his accounts monthly, things which are absurd in regard to a foreign agent. Nor did the secretary of the navy think so, for he revokes the appointment; he does not remove the incumbent; he abolishes the office instead of changing the officer; had the office been created by the act of 1809 he would have had no authority to do so. 2. If then Mr. Armstrong was not appointed under this act, his compensation does not depend on it; it is not limited to one per cent. but he is entitled to customary commercial commissions. This court has the power to decide on principles of equity and ought to do so. There should not be one rule for individuals and another for the government; if there were nothing to bind it to a uniform rule it would be just and equitable. But the government has itself fixed such a rule; Mr. Hay, a principal officer of the department, gave Mr. Armstrong reason to believe so when he accepted the office. Mr. Hogan's compensation at a port on the same coast with Lima was five per cent. Mr. M'Call was allowed two per cent. on the immense disbursements made by him in the Mediterranean. Mr. Hayne at Marseilles, and Mr. White, afterwards in the Pacific, received large and liberal commissions.

The refusal to allow Mr. Armstrong five per cent. on the value of the stores distributed by him, and delivered over to his successor, rests on the same assumption, that being appointed under the act of 1809, his sole compensation is "one per cent. on the public moneys disbursed." It is of course met by the argument heretofore offered, but in regard to these items it presents the additional hardship, that it actually deprives the agent of all compensation for the largest and most responsible branch of his duty, the distribution of stores. It proves also conclusively that this act applies only to domestic navy agents, for they do not distribute the stores, that duty being intrusted to the naval storekeepers, officers appointed in all the domestic agencies for that purpose, but not

known in the foreign agencies. The claims by Mr. Armstrong for the repayment of the clerk hire and the damages on a protested bill, seem to be too just to admit of discussion. He was authorised to employ a clerk, and he has proved that he paid him the amount claimed; if the sum of one thousand dollars was the limit fixed by the department, that was not known to the complainant, and, had it been, could not be complied with; he did a thing which was permitted, and is entitled to be paid what it cost him. So as to the bill of exchange; he was expressly authorised to draw it by his original letter of instruction; it was drawn before he received any notice that he was superseded; and as the refusal of the government was founded on a belief that this was not the case, which belief proved to be erroneous, they must bear the cost of the mistake.

The payment of Mr. Armstrong's expenses and compensation while detained at Lima, and the cost of his return and visit to Washington, is a demand properly addressed to the equitable consideration of the court. He was five thousand miles from home, holding an office which he expected to retain for four years at least, and had incurred expenses under that impression. No complaint was made or fault found; not only this, but his bills rightfully drawn were protested; he was obliged to remain in order to meet them, and also to perform the duties of his office, at the express request of the commander of the squadron, until his successor arrived. Under such circumstances, if no indemnity be given, he should at least be protected from loss. His return home was, as it were, compulsory, made suddenly, and without his means being prepared. It was necessary too, in order to settle his accounts; in the naval service an allowance would be made to an officer brought back under such circumstances. The refusal to allow the remaining claim for the value of the tobacco furnished by Mr. Armstrong, seems to have arisen from some vague notion of his having acted improperly about it. The evidence does not confirm this. It is true he formerly owned the tobacco himself, but he has proved a bona fide sale of it to a Mr. M'Culloch; and when he repurchased it, he had the positive instructions of the commander of the squadron. He is actually allowed a credit for a small part of it, which was used by the vessels of the United States. He delivered all of it to their agent, by whom it is still retained, and he is surely entitled to be paid for that which they keep from him, as well as that which their sailors actually consume. 2 Story's Laws, 1123, [2 Stat. 535;] U. S. v. Macdaniel, 7 Pet. [32 U. S.] 16.

Gilpin, for the United States.

On the 24th April, 1828, the complainant was appointed an officer of the United States; the appointment was made as the constitution directs, by the president, by and with the advice and consent of the senate; he received a commission under the seal of the United States; that commission designates him as "navy agent at Lima, in Peru." This, then, is his office, expressly designated; he is a navy agent; he is to perform the duties and receive the compensation of such an officer. He does perform the duties until the 1st October, 1830. In presenting his claim for compensation, he demands certain allowances which are refused by the accounting officers of the treasury, because a navy agent is not entitled to them. He appeals to this court to reverse that decision. The first and preliminary question is, whether or not the law has recognised the office of a navy agent, described its duties, and fixed its compensation? By the first law relating to supplies for the navy, passed on the 7th August, 1789, the secretary of war was directed to purchase stores for the navy as well as the army, but no arrangement was made for subordinate officers. On the 23d February, 1795, the office of purveyor of public supplies was established, with a salary of two thousand dollars, for the purchase of all naval and military stores; and on the 16th July, 1798, the navy department having been in the meanwhile organised, that officer was placed under the orders of the secretary. By the same law, all 'agents' for supplies for the navy were required to settle their accounts with the accountant of the navy; and in the appropriation law of 1807, there is an allowance for their commissions. During the whole of this period they were thus mere subordinate agents, under the purveyor of supplies, holding no commissions, and not being officers appointed by law. This system being found very inconvenient, a law was passed on the 3d March, 1809, [2 Stat. 535,] directing that all permanent agents for purchasing supplies or disbursing money for the navy, should be appointed by the president and senate, receive a compensation not exceeding that of the purveyor of supplies, which was two thousand dollars a year, and give bond; the compensation to be derived from "a commission of one per cent. on the public moneys disbursed by them." This established the present system of navy agencies, and led to the abolition of the office of purveyor of supplies soon after. On the 15th May, 1820, [3 Stat. 592,] a law was passed declaring that "navy agents shall be appointed for the term of four years, but shall be removable from office at pleasure."

Such was the law relative to navy agents when the complainant became a public officer; he was appointed, commissioned, and gave bond in the usual mode; he performed the usual duties; he has received the authorised compensation of one per cent. on his disbursements. He claims, however, the large additional sum of seventeen thousand six hundred and thirty-one dollars and thirty-seven cents, under various pretexts.

1. He asks to be allowed four per cent. ad-

·ditional, on his disbursements. To sustain· this he must show either a law, contract, or usage. He can produce no law authorising it, for none exists. The contract he alleges is a conversation with Mr. Hay, chief clerk of the navy department; if that officer had made a contract, it would not have bound the United States, especially when a law fixed the compensation; but in fact, it was altogether too vague to be regarded even as an understanding. What is meant· by ·customary commercial commissions? They vary under a thousand circumstances; in this very case it is proved that M'Call got two per cent. and Hogan five; there is no date given, but this conversation is said to have been "about the time of his appointment;" long afterwards the secretary writes him formally, instructs him at large; would he have omitted so important a contract, varying as it did from the law? Besides, he is directed to govern himself by this law in keeping and rendering his accounts: was it meant he should so totally deviate from it in charging compensation? It is impossible to establish a contract between the United States and the ·complainant on such grounds as these, especially a contract directly in the face of an ·existing law, to which he was explicitly referred. But he says he is entitled to this additional compensation by the usage of the ·department. To prove such usage he must produce a similar allowance in a similar case. He cites those of M'Call, Hogan, Hayne and White. They all differ materially; each was a special agent of the navy department, acting under a written contract with the secretary, and performing services specially designated; neither of them was appointed by the president, or commissioned; their compensation and duties varied according to a previous written agreement; it is no ground of similarity of office that both were in a foreign country, unless their appointments were similar; navy agents may be appointed at home or abroad; special agreements may be made by the department with persons at home or abroad; it is identity in the mode of appointment or terms of agreement that establishes a right to equal compensation, and any such identity the complaint has entirely failed to establish. If, therefore, he can show neither usage, contract nor law which gives him a different compensation from that allowed him by the act of 1809, his claim has been justly refused.

2. He asks five per cent. on the stores he distributed. The law does not allow it; his compensation is confined to the commission on money disbursed. But would it be just? There is no difference between the moneys disbursed and the value of the stores distributed; he disburses the money he has received from the government in buying these stores; he receives his commission on it; and to receive it again on the distribution would be to charge a double commission on the same funds.

3. He asks five per cent.· on the·stores delivered to his successor. This is not allowed by law; nor is it just, since, as in the case of those distributed, he has already received his commission on their purchase.

4. He asks for clerk hire beyond a liberal allowance already made. The only ground for such a claim at all is the usage of the department, and the sum that recognises has been already paid him.

5. He asks for the return of damages on his protested bill. He had a large amount of funds on hand when he drew it; besides his own commissions, he had twelve thousand dollars at least of public money. In every case where such payments have been allowed, it is where the government have been mistaken in supposing the agent had funds; to allow him to draw ad libitum would be the height of indiscretion; and if he does so when he was not in want of the money, he must suffer the loss.

6. His demands for compensation at Lima and on his passage home, are entirely without law or precedent; he was not an officer of the United States during the time he asks for it; he was a private merchant, and remained there at his own pleasure; he produces neither law, agreement nor precedent to sustain it: where such allowances are granted it is by express law, as in the case of foreign ministers, or when an officer is ordered home, as sometimes in the navy; he could not have waited on account of the protest of his bill, since that was not to be anticipated; and if it was, his claim to damages would have been equally good without such delay; he could not have believed that a mere request, by the commander of the squadron, to perform an occasional service, would entitle him to the emoluments· of an office in which he was formally superseded.

7. His claim to be paid for the tobacco has been allowed, for all that he actually furnished, but he has no right to ask payment for all he chose to purchase; it is proved that he bought it for himself, not for the United States; he had no right to buy it for the United States, because by express regulation it was not an article included in the stores to be supplied by the navy agents; an order from the commander of the squadron to him, to do what was forbidden by the department, offered him no excuse; and finally he never did transfer it to the United States, since their officers refuse to receive it.

The complainant having thus failed to establish his claims for additional compensation, must limit himself to that allowed by law; this amount he has already received; consequently he is authorised to make no deduction from the balance of public moneys still in his hands; but the United States have a right to the removal of this injunction altogether, that they may proceed to recover their money in the usual course of law.

J. R. Ingersoll, for the complainant, in reply.

Mr. Armstrong received an appointment important to the public; he discharged its duties faithfully; he abandoned his own concerns; he returned to the United States when all was over; and what was his pecuniary account at last? The sum which has been proved to be the usual cost of living, added to the expenses of his passage, exceeds by nearly three thousand dollars, the amount allowed him by the accounting officers of the treasury. This may be said to be his ill fortune; yet surely it must infuse a spirit of equity into his case. The difference between him and the United States is seventeen thousand six hundred and thirty-one dollars and thirty-seven cents. Of this, the largest and most interesting item, is the charge for commissions, whether on disbursements of money, or distribution and delivery of stores; these are identified in their principal features, in none are they essentially different; the grounds taken are applicable to them all. That the complainant has earned the legal compensation of his office or place is admitted; the quantum of that compensation only is disputed. It is perfectly clear the United States made no contract with him, at the rate of one per cent; and if that only is due, it is on account of the express provision of the law. But on the other hand, there was an arrangement positively made, which might not indeed be a contract, for it wanted the formalities of one, yet was a complete understanding between the complainant and that officer of the United States who, in the absence or illness of the secretary of the navy, took his place; and this arrangement fixed the compensation as Mr. Armstrong asks it. When formal instructions were afterwards given to him, not a word was introduced to change it; on other points they were broad and full, as to this they left him where he had been already placed. The opinion he thus had a right to form, was strengthened by what he observed as to every one in a similar situation; he saw the allowances to the same officers at Barcelona, Marseilles, Valparaiso, and elsewhere abroad; he observed no resemblance between his duties and expenses, and those of navy agents at home, but every resemblance between himself and those abroad. The result of all this is therefore exactly the same, whether deduced from actual arrangement or the want of it; from what is usual in similar circumstances, or what ought to be expected in those which are entirely new; this result is, that, at the worst, there is an implied assumpsit, a quantum meruit, a compensation in proportion to his services. When exception is taken to so just a principle, it must be, it ought to be extremely clear. Is that so, which is now taken by the government? They found it on a difference, said to be created by the law of 1809, between permanent and special agents; but

this does not help them, unless they can show which is one and which is the other. To do so, they produce a commission as the badge of distinction; for this, there is no reason except that it suits the present case; surely it does not make Mr. Armstrong's like a one per cent. agency, if unlike it in every other particular. The difference really is, that in the special agencies there are previous special agreements, previous special instructions; it was so in this case, in M'Call's, and in others alluded to; when, therefore, we are told that the law of 1809 forms the rule, we answer that Mr. Armstrong is not within the law, more than those persons were. When the law of 1809 created permanent agents, it created entirely new officers; no permanent navy agencies existed before; after this, these offices were created, places attached to the navy yards, and in their character, steady and durable; but certainly in doing this, it did not transform the duties arising from the transient visit of a squadron in a distant ocean into a permanent office. Nor can the mere granting a commission do so, as seems to be supposed, even if this be a commission which wants the attestation of the secretary of state, and which the president can, as he has done, summarily revoke. It has been attempted to meet this argument, by endeavoring to show that the agency of the complainant differed from those abroad, and resembled those at home; this attempt has failed in nearly every particular; in the nature of his duties, his powers, responsibilities, residence, and mode of settling his accounts, he is like the former not the latter. If then the United States have failed to show any agreement with him at the rate of one per cent., or any law limiting him to that sum, within which he can be fairly brought, he is entitled to the usual compensation for such services at Lima, and that is certainly as much as he has claimed. 1 Story's Laws, 49 [1 Stat. 68;] Marbury v. Madison, 1 Cranch, [5 U. S.] 155.

His claims for clerk hire, for compensation during his detention at Lima, and for his expenses home, as well as for the repayment of damages on his protested bill, rest on grounds of incontrovertible equity. They were payments actually made by him, either for the United States or on account of requests or mistakes of their officers. It has been already seen that his aggregate expenditure very far exceeded what is allowed him; if it be shown that this excess arose from duties actually imposed upon him, it becomes highly unjust to refuse its payment. The only remaining claim is that for the tobacco. Mr. Armstrong was expressly ordered in his instructions to furnish supplies to the commander of the squadron, when they were called for; there was no limitation in this order, and the supply in question was made on the positive requisition of Commodore Thompson; it would

have been his duty to do so, under his instructions, even had there been a regulation such as is supposed; but there is no proof whatever of any such, at least communicated or known to Mr. Armstrong. As to the allegation that it was a speculation of his own, it is sufficient to say that the property was wanted by the United States, examined and approved by their officers, paid for at a price which they deemed fair, and is now actually in their use and. possession.

HOPKINSON, District Judge, delivered the following opinion:

On the 24th day of April, 1828, Andrew Armstrong, the complainant, was appointed, by the president, by and with the advice and consent of the senate of the United States, navy agent for the port of Lima, in Peru, in South America. The commission which testifies this appointment bears the date above mentioned, and declares that it is "to continue in force during the term of four years from the 24th of April, 1828." The letter of instructions given to Mr. Armstrong, from the navy department, is dated on the 16th January, 1829. By the act of congress passed on the 15th May, 1820, [3 Stat. 592,] it was enacted that navy agents, with other officers mentioned in the act, "shall be appointed for the term of four years, but shall be removable from office at pleasure." In April, 1830, the president revoked the commission or appointment of the complainant, but the notice of the revocation, contained in a letter from the secretary of the navy of that date, did not reach the complainant until October following. He continued to reside at Lima until January, 1832, when he left it to return to the United States, going first to Valparaiso, from which port he sailed in March. On a settlement of his accounts with the government in July, 1832, a balance was struck against him of twelve thousand nine hundred and forty-nine dollars and sixty-three cents, which, by a subsequent small credit, was reduced, in August, to the sum of twelve thousand eight hundred and seventy-five dollars and forty-four cents, now claimed by the United States. On the other hand, the complainant has presented an account or claim for credits against the United States, which, if allowed him, will not only absorb the whole demand upon him, but will turn the balance in his favour to the amount of four thousand six hundred and eighty-one dollars and. seventy-four cents. The United States, to enforce the payment of the amount they allege to be due to them from the complainant, proceeding under the directions of an act of congress passed on the 15th day of May, 1820, [3 Stat. 592,] have issued a warrant of distress against the alleged delinquent officer and his sureties, directed to the marshal of this district, in which the said officer and his sureties reside. This warrant has been executed by the said

marshal according to the provisions of the said act. By the fourth section of the act, "if any person shall consider himself aggrieved by any warrant issued under it, he may prefer a bill of complaint to any district judge of the United States, setting forth therein the nature and extent of the injury of which he complains; and thereupon the judge aforesaid may, if in· his opinion the case requires it, grant an injunction to stay proceedings on such warrant altogether, or for so much thereof as the nature of the case requires." Under this provision the complainant filed his bill of complaint, whereupon, he having complied with the requisitions of the act, an injunction was issued to stay proceedings on the warrant of distress. The district attorney has filed a full answer to all the matters complained of in the bill, and the cause has been heard on this bill and answer, with the vouchers and other evidence produced by the parties respectively. The complainant complains of the rejection or refusal of certain credits in the settlement of his accounts with the government to which he alleges he is entitled in law or equity; and the district attorney denies altogether his right in law or equity to any of the allowances he claims, and prays that the injunction may be dissolved, so that the marshal of this district may proceed, under his warrant of distress, to levy and collect the said sum of twelve thousand eight hundred and seventy-five dollars and forty-four cents, remaining due from the complainant to the United States. It is now to be decided, so far as this court may decide it, whether the said injunction shall be continued altogether, or dissolved altogether, or in part; and, if the latter, for what amount it shall be dissolved, and the United States be permitted to proceed under their warrant of distress against the complainant and his sureties. To determine this question, it is necessary to examine every item of credit claimed by the bill and denied by the answer.

The first credit claimed by the complainant, which has been refused to him by the accounting officers of the United States, is a charge of five thousand seven hundred and fifty-five dollars and eighty-six cents, being for commissions on his disbursements of moneys as navy agent at Lima. On these disbursements an allowance has been made to him of one per cent., and the present claim is for an additional or further allowance of four per cent., making a commission of five per cent. in the whole. On the part of the government it is contended, that a navy agent of the United States, whether he reside abroad or at home, is entitled to no more than one per cent. on his disbursements of moneys, by the express enactment of the act of congress of 3d March, 1809, [2 Stat. 535.] On the other hand the complainant avers, that he was not appointed under that act, and is not subject to its provisions

nor bound by its restrictions, but is entitled to a compensation for his services according to their nature and extent and the usual mercantile commissions for similar services at the same place, which were five per cent. The real question on this part of the case is, whether the complainant was appointed a navy agent under and subject to the act of congress of 3d March, 1809, or not; for, if he were so, that act, after declaring the manner in which agents shall be appointed for the disbursements of moneys for the use of the navy of the United States, authorises the president to fix the number and compensations of such agents; "provided, that the compensation allowed to either shall not exceed one per centum on the public moneys disbursed by him." If, then, the complainant was a navy agent described by the said act; if he received his appointment and authority under and by virtue of it; he must be bound by all its provisions. The argument on this item has, therefore, been directed to this question.

The attorney for the United States has contended that the complainant was an officer of the United States, not the agent of a department; that he was a navy agent of and for the United States, appointed as such by the president and senate by virtue of the act of congress referred to; that previous to that act no appointments or commissions of such agents were ever given by the president, or by the president and senate, as this was, and as this act directs; that previous thereto, persons had been, from time to time, appointed by the secretary of the navy, at his pleasure, to perform certain prescribed duties for his department, under such contracts and arrangements as he chose to make with them; but that the appointment of the complainant was clearly not of this description, but was made or could have been made only under the act of 1809. The counsel for the complainant deny that he was an officer of the United States at all; they deny that he was appointed to the service he performed under the authority of the act in question; but that his services were performed for the navy department, in the same manner, by the same authority, and with the same rights of compensation as the agents that had been appointed by the secretary of the navy at other places. The cases of, and allowances made to, Messrs. Hogan, M'Call and others, have been much insisted on as forming precedents for this; and the distinction relied upon between such agencies as are, and such as are not, within the regulations of the law of 1809 is, that they are to be applied only to those navy agents whose duties are to be performed in the United States; not to those who must reside in a foreign port.

After giving a close and careful attention to the arguments and illustrations of the counsel for the complainant, I cannot follow them to their conclusion. It appears to me to be entirely clear that the appointment of the complainant, as a navy agent at Lima, was an office of the United States, and not a mere limb of the navy department; that he was an officer of the United States deriving his authority from the constitutional appointing power, the president and senate; that their power to appoint navy agents was derived from the act of congress which created or established the office. Previous to the passage of the law of 1809, there were no such officers, either at home or abroad, properly so called, under the constitution of the United States. The constitution gives the power to the president to nominate, and, by and with the advice and consent of the senate, to appoint ambassadors, other public ministers and consuls, judges of the supreme court, and all other officers of the United States, whose appointments are not herein otherwise provided for, and which shall be established by law. In conformity with this provision of the constitution, congress have established, by law, the office of navy agents, and the president, with the senate, has appointed the officer. Prior to this law the purchase of supplies and the disbursements of moneys for the use of the navy, were made, directly or indirectly, by the secretary or his agents; the state of the navy did not require a distinct office and officers for these purposes. These duties or services were performed by persons named for the occasion by the secretary, and, as I have said, they were his agents, his arms, and not officers of the government. They were neither appointed nor removable by the president, any more than a clerk in the department; their agency began and ended with the pleasure of the secretary, or with the particular service for which they were employed. As our naval establishment was extended, and these services became numerous and important; as the operations of these agents became of great magnitude, involving the expenditure of vast sums of money; it was wisely thought they should no longer be entrusted to the agents of a department, irresponsible in some degree directly to the government, and without any security beyond their own responsibility, for the faithful performance of their trust. The patronage, too, may well have been thought to be of too high a character and value to be attached to a department. The law of 1809 was intended to put these concerns under a better regulation. The third section enacts, "that exclusively of the purveyor of public supplies, paymasters of the army, pursers of the navy, military agents, and other officers already authorized by law, no other permanent agent shall be appointed, either for the purpose of making contracts, or for the purchase of supplies, or for the disbursement, in any other manner, of moneys for the use of the military establishment, or of the navy of the United States, but such as shall be appointed by the president

of the United States, with the advice and consent of the senate." It is then enacted that the president may fix the number and compensation of such agents, but with a limitation as to the latter, "provided that the compensation allowed to either shall not exceed one per centum on the public moneys disbursed by him." The fourth section requires a bond from the agent, with one or more sufficient sureties, for the faithful discharge of the trust reposed in him. All this appears to me to be very intelligible. We see no intimation of the distinction, essentially and necessarily relied upon by the counsel of the complainant, between foreign and domestic agents, in the mode of appointment, the tenure and permanence of their offices, or the terms on which they may receive them. The construction contended for, taking the foreign agents altogether out of the act, would not only deprive the president and senate of their appointment, but dispense, in their case, with the security to be given for the faithful discharge of the trust reposed in them, as well as of their limitation of the compensation to one per centum on their disbursements. As regards the bond or security, it would seem to me, to be infinitely more necessary in the case of a foreign than a home agent, who is always under the eye and control of the government, whereas the other carries on his operations in a distant country, and might be guilty of the grossest irregularities and frauds for a long time, before they would be known; and when known the delinquent would be out of the reach of the government with all his spoil. It has not been pretended that domestic agents are not subject to the provisions of this law, for this would be to repeal it wholly as to all navy agents, and I think it has not and cannot be shown, that any distinction is made by the law, or by the reason and design of the law, between the agents appointed for foreign or home stations. These are equally within or without the law; they are both clearly within it, in their appointments, their duties, their responsibilities, and their compensation.

It has been argued, with great earnestness, that this act has relation only to permanent agents, and that a navy agent abroad is not a permanent agent, for he is removable at the pleasure of the executive, and, in fact, in this case a removal was made in fifteen months, whereas the foreign agents appointed before the passage of this law continued undisturbed for many years. The first difficulty this argument has to encounter is, that it applies with the same force to the agents at home, who hold their offices in the same way, and may be removed by the same power that acts upon those abroad: and thus the distinction so carefully set up between foreign and domestic agents is overthrown. What is the meaning of a permanent agent as understood in the law? Cer-

tainly it does not designate the place of residence as affecting the description. Can we say that the complainant was not a permanent agent because he was removable, or because he was actually removed, by the president? Does the legal character or description of the appointment depend upon the exercise of the right of the president over the officer? This is clearly not the meaning of the law, as is apparent from the act of 15th May, 1820, which enacts, that 'navy agents,' with other enumerated officers, "shall be appointed for the term of four years, but shall be removable from office at pleasure." The navy agents here referred to are certainly those which are appointed under the law of 1809 by the description of permanent agents. The phrase then 'permanent agents,' signifies those agents which shall be appointed by the president, with the advice and consent of the senate, in contra-distinction to those persons who had been or should be appointed by the secretary of the navy, on some special occasion or service, in his discretion and on such terms as he, on his official responsibility, should choose to arrange and make with the persons so appointed by him. The officer who takes his appointment from the president and senate, under the constitution and law of the United States, testified by his commission, which makes him independent of the secretary, and removable only in the manner and by the power given by the constitution and the law, may well be considered, legally, to be a permanent officer or agent of the United States. When the law declares that no permanent agent shall be appointed but by the president and senate, it, in effect, declares that the agent who is so appointed, is, within the meaning of the law, a permanent agent. The district attorney is a permanent officer of the government, although removable at pleasure, and commissioned just as a navy agent is, in contra-distinction to a special or temporary attorney, who may be employed for a particular cause or service. The cases of Messrs. Hogan and M'Call have been frequently urged upon the court in the argument. It might be enough to answer that they clearly were not appointed under the law of 1809; but made their contracts with the secretary of the navy for the services they undertook to perform. They were not officers of the United States; they were not appointed as such officers must be. They did not derive their agencies, such as they were, from the president and senate, nor were they appointed under the authority of the act of congress. Contracts were made with them by the secretary of the navy under a discretionary power exercised by him. It is true that abuses may be practised in this way; but they are not to be presumed. It is true that under the pretence of making a special agent, under a special contract, a navy agent may be placed in a foreign port by the secretary, with any rate of compensation

he may agree to, and without the securities required by law from navy agents for the faithful discharge of their trust, and such an agency may be continued for many years, as has been done, performing all the duties of a permanent navy agent and no more. Such cases might be an evasion of the provisions of the law by the secretary; but they are always under the control of the president, who, by appointing a permanent agent, would supersede the special agency. The complainant in this case went abroad, not with any such special contract in his pocket, but with his commission as the only evidence of his appointment; the only source of his authority. This commission was given to him under the law of 1809; it could have been given to him under no other legal authority, and he took it as an appointment under that law, and subject to all its provisions. I am of opinion that he is entitled to no more than one per centum on the moneys disbursed by him for the use of the navy of the United States; and, of course, that he cannot be allowed the credit he now claims of an additional four per. cent., amounting to the sum of five thousand seven hundred and fifty-five dollars and eighty-six cents. The one per cent. he has already received a credit for.

I have said nothing of the alleged conversation between the complainant and Mr. Hay, a clerk in the navy department. Our knowledge of it and of the time it occurred, is by no means satisfactory; but no such conversation, nor any opinon or representation of Mr. Hay, or any other officer of the government, can have any effect upon the provisons of the act of congress. If the complainant can show that he accepted his commission in consequence of these representations of Mr. Hay, he may have a case for the equity of congress; but we are bound to obey the law.

The next credit claimed by the defendant, and which has been rejected by the accounting officers of the treasury, is a charge of commissions on the distribution of stores, amounting to six hundred and sixteen dollars and twenty-three cents. There is another claim on the same account of four hundred and twenty-seven dollars and seventy-six cents. They will be considered together. The act of 1809, which creates the office of a navy agent, has also fixed his compensation wholly or in part. We must recur to it for the decision of the question on the distribution of stores; obeying the directions of the law, where they are clear and explicit, and giving it a fair and reasonable construction where they are not so. It enacts, that the president may "fix the number and compensation of such agents; provided that the compensation to either shall not exceed one per cent. on the public moneys disbursed by him." There is, in my mind, something equivocal in this form of expression. Does it mean that the whole compensation of the agent, for all his services, shall not exceed one per cent. on the moneys he shall disburse; or that the compensation for or on account of his disbursement of moneys shall not exceed that rate. Perhaps the more strict and the more obvious construction of the words, as they stand in the law, would be that the whole compensation, for all the services of the agent, shall be one per cent. on the moneys disbursed by him. But it is not explicitly so said; and if we are permitted to resort to construction, as in a doubtful clause, it does not appear to be the most equitable interpretation of it. What is the difference in labour or responsibility, between distributing stores, and disbursing moneys for the use of the navy; unless we should say that the first is the more laborious and troublesome of the two. They are distinct services in every respect, and why should they be confounded in their compensation? If we look to the practice, under contracts made by the secretary with his agents, these subjects of service have been kept separate, and a commission charged and allowed for each. I must be understood to comprehend in this view only, such stores as were sent out by the government to the agent to be distributed by him to the navy, and not those which have been purchased by him, and for which he has already received his compensation in a charge of commission on the moneys disbursed for the payment. The charge now made by the complainant is understood to be only for the stores furnished by the government.

If we adopt a more rigorous construction of the law, and allow to an agent nothing but his commissions on the disbursements of money for all his services, a case of manifest injustice might occur. The location of an agent might be such, that it would be more convenient or economical for the government to send him every thing, or nearly so, that could be there wanted for the use of the navy; he would then have little or no money to disburse; while his labour in taking care of the stores and distributing them would be very great and unrewarded. By turning to the third section of the act, which creates this office, the duties of the officer, in the view of the legislature, and to which the stipulated compensation may be supposed to refer, are as follows: the "making of contracts, the purchase of supplies, and the disbursements of moneys for the use of the navy." No stores or supplies seem to have been contemplated by this law, but such as were purchased by the agent, and for which, of course, he had received his commission on the disbursements in making the purchase. But the distribution of stores or supplies not purchased by him, and for which service he has, in no shape, received any compensation, seems not to have been considered or distinctly provided for in the description of the duties to be performed by the agent, or in fixing his compensation for his services. In

the credit now claimed, such a one as the head of the department was authorised to allow, in the exercise of his equitable discretion in the settlement of the accounts of a public officer? Or is it so clearly prohibited by the act of 1809, that to allow it would be a violation of that law? In the latter case neither the secretary nor the court has any power over it; in the former, the court may do whatever the secretary might have done. We may give the credit, if we are satisfied to consider the service for which it is claimed, as a casus omissus in the law, not provided for by it, and not within the restriction of compensation there imposed. In such a case we may consider the equity of the claim arising from the performance of a service, for which no remuneration has been made, and its allowance or disallowance would be subject to the discretion of the court under all the circumstances of the case. It is not a credit of positive right, for it is not promised by the act of congress, or by any contract with the government; and its allowance, as an equitable charge, will always depend upon the facts upon which the equity is founded. Such an equity may be found in one case and not in another; and each will be governed by its own circumstances. On this item, I have concluded, not without much doubting, to allow a commission of one per cent. on the value of the stores or supplies distributed by the complainant, and not purchased by him, but furnished by the United States. The credit claimed in his account, is five per cent. or ten hundred and forty-three dollars and ninety-nine cents; the allowance will be one fifth of that sum, or two hundred and eight dollars and eighty cents. As connected with this part of the case, I will dispose of the charge of one hundred and eighty-three dollars and twenty-four cents, commissions on stores and provisions delivered over by the complainant to his successor, Philo White. This charge is wholly inadmissible. It has none of the considerations in its favour which have influenced my decision on the last two items. The whole service was probably the delivery of a key to Mr. White. It was his duty to put his successor in possession of the public stores, and can afford no ground for a commission, on any principle of the most liberal equity.

A charge for clerk hire is not deemed, at the treasury, to be an improper credit to the complainant, and one thousand dollars have been allowed for that object. The balance two hundred and sixty-eight dollars and seventy-five cents, was rejected as an excess of what was thought to be a necessary or reasonable expenditure on this account. The complainant has exhibited receipts showing that the whole amount claimed by him has been actually paid to his clerks. He asks only for reimbursement. It must be allowed, as there is no evidence of any bad faith or wanton extravagance in the expenditure.

The sum of eight hundred and sixty-three dollars and thirty-three cents, is claimed for damages and interest paid to Alsop & Co. on a bill drawn by the complainant on the secretary of treasury, on the 16th August, 1830, which was protested for non-acceptance and non-payment. The protest of this bill was permitted by the government under a mistake of the facts concerning it. The complainant, while legally acting as navy agent, had an unquestionable right to draw bills on the government; and many had been drawn and paid. The only reason for refusing this, was a suspicion or belief that it had been drawn after the complainant had notice of the revocation of his appointment, and, of course, after his right to draw had ceased. This was altogether a mistake. The letter of revocation was dated in April, 1830, but did not come to the knowledge of the complainant until October following, several weeks after the date of the bill, which was, therefore, rightfully drawn. When the truth of the transaction was known, the bill was paid; but the damages, which were paid by the complainant in consequence of the protest, by the mistake of the government, and for no fault in the complainant, have been withheld, and the loss thrown upon him. I cannot see on what principle of law or equity this has been done. In such a case, between a factor and his principal, can it be doubted that the factor would be entitled to a full reimbursement of such a payment. This credit must be given to the complainant.

The next two items will be considered together. They are so manifestly unsupported by the facts and reason of the case, that it is a subject of regret as well as surprise, that the complainant should have introduced them into his account. The first is a charge of sixteen hundred and nine dollars and eighty-seven cents, for his board during his detention in Lima, owing to the protest of his bills, say from the day he ceased to be navy agent, the 1st of October, 1830, to the 20th of January, 1832, at three dollars and thirty-seven cents per diem. The second is a charge of three thousand two hundred and twenty-nine dollars and fifteen cents, for his compensation for the above time, at the rate of two thousand five hundred dollars per annum.

As to the detention at Lima, owing to the protest of his bill, if we could agree that the protest of this bill, drawn by him as an officer of the United States, and for the payment of which he was not responsible, could afford a reason for his remaining at Lima at the charge of the United States, it is not to be doubted, on the clear evidence of the case, that he did not remain there for any such reason, but for his own purposes, or at least, at his own pleasure. He remained at Lima, after notice of his removal from office, eight months before he knew of the protest of his bill, and during that time he had not any

suspicion that it would be protested. Yet these eight months are a part of the period during which he alleges that he was detained at Lima, "owing to the protest of his bills." Again, he was informed of the payment of the bill in October, 1831, but his charge for detention runs on to the 20th of January, 1832, and he did not actually sail for the United States until March, 1832, either because he was attending to business of his own, or, it may be, waiting for a suitable conveyance. In the face of such facts I cannot admit that the protest of the bill had anything to do with his remaining at Lima; and if it had, I do not see that the protest made such a necessity for his detention, as to raise a claim against the United States for it.

The claim of compensation, amounting to three thousand two hundred and twenty-nine dollars and fifteen cents, for services as navy agent, after the revocation of his appointment and during the alleged detention at Lima, is still more unreasonable. The claim is made for the time between the 1st of October, 1830, and the 20th of January, 1832. Now it is not questioned that Philo White, the official successor of the complainant, arrived at Lima, took possession of the stores, and assumed all the duties of the appointment, in May, 1831; and yet, in the face of this fact, the complainant has made a charge as an acting navy agent, until January, 1832, full eight months after he had ceased to have any connection with the office, its duties, or services. It is true that when, in October, 1830, the revocation of the complainant's appointment came to Lima, he was requested by Commodore Thompson, to continue to act as agent, as his substitute had not arrived, in procuring supplies for the squadron, and taking charge of such stores as might be sent out for its use. We may presume that he did so. But what were the services he performed under this appointment or request of Commodore Thompson? Merely to procure supplies, and receive and distribute stores. For these he has been paid by his commissions on the moneys disbursed for the purchases, and on the stores distributed by him. I cannot but observe that in the same account, in which he has charged a commission of five per cent. for these services, he has also claimed a compensation for them, in the shape of a salary, at the rate of two thousand five hundred dollars a year.

I have felt a strong disposition to allow the credit of three hundred and fifty dollars paid by the complainant for his passage home. He left his country, and his business and prospects here, whatever they were, under an appointment by the government, which purported, by the terms of his commission, to continue for four years, and as much longer as the office and his services might be thought useful and acceptable. It is true he had no legal right even to this period of enjoyment, but he had a reasonable expectation of it, provided he gives no cause for disappointment by his own conduct. No complaint seems to have been made of his ability or fidelity, and he had been but about fifteen months in the enjoyment of the place, when his appointment was revoked. Under such circumstances, we can see and feel that a strong moral equity arises, to bring him back to the place he was taken from. Between individuals, a conscientious and just man would, I think, have done so. But no instance has been shown, under any such circumstances, of the recognition of a right, legal or legally equitable, in an officer who has been removed, or whose office has been vacated, to charge the government with his return home. I am afraid to set a precedent contrary to all usage, and must disallow this credit or charge. So with the complainant's traveling expenses in going to Washington to settle his accounts. The only remaining item or charge in the complainant's account, is for the tobacco sold or furnished by him to the United States, amounting to four thousand two hundred and seventy-nine dollars and sixty-eight cents. I can have no hesitation in allowing it.

In the letter of the secretary of the navy, to the fourth auditor, of the 25th June, 1832, he says, the tobacco must depend on the fact whether the authority to purchase was revoked generally; and whether the revocation reached the Pacific station before this purchase was made. If not it should be allowed; otherwise it should not. This is a very partial and imperfect view of the question; and it is probable that all the facts of the case were not known to the secretary. We have them now in evidence. The answer of the United States to the bill of the complainant does not deny or admit, that a report of this tobacco was made by the complainant, in his accounts, to the department, nor that it was surveyed by order of Commodore Thompson, as part of the public stores of the United States, and, as such, delivered over by the complainant, to the successor in office, and regularly receipted for by him on behalf of the United States. But it is insisted, that if all these things are true, they do not authorise the charge. And why? Because it is denied that the tobacco was purchased on public account; or by authority or instructions of any officer of the government; and it is averred that tobacco is not an article which a navy agent is authorised to purchase on public account, but that it is to be furnished to our ships by the pursers as part of their stores. It is also averred that the tobacco was the private property of the complainant. shipped to him from Norfolk, on his own account, and still remains his private property, and has never been accepted or legally transferred to the United States; that the navy department has never received any part of it, or interfered with it, or done any thing to recognise the validity of any transfer or

purchase thereof; and that no officer of the department or the navy, had any authority to do so.

In answer to all these denials and averments, what are the plain and uncontradicted facts of the transaction? This tobacco was originally purchased in Virginia, as the United States allege, as the private property of the complainant; after its arrival at Lima, it was sold by him to a Mr. M'Culloch; it was afterwards re-purchased by the complainant, as he alleges, for the United States. A part of this tobacco was distributed or delivered by the complainant, before his removal from office, to certain ships of the United States, and the residue, remaining in the store of the United States, was handed over, with the other stores, to Mr. White, the successor of the complainant, having been first surveyed by order of Commodore Thompson. From that day to this not a pound of it has been in the possession or under the control of the complainant; but that which has not been consumed in the ships of the United States, has continued in the possession of their agent. Why need we inquire whether, by the regulations of the navy, tobacco is to be furnished to our crews by a navy agent or a purser? If such be the regulation, undoubtedly it would have been a good and sufficient reason for refusing to receive this tobacco, either on board of the ships, or as part of the stores of the United States, and for leaving it on the hands of the complainant, for profit or loss as might happen; but it can never afford a justification for receiving the article, for actually consuming a part of it, and for retaining the residue, and refusing to pay for it. As for that part which has been delivered to the ships, a credit has been allowed, and thus far, at least, the purchase and sale have been recognised and adopted by the department, notwithstanding the alleged navy regulation. In what respect, or on what principle of justice or equity, does the part of the tobacco, for which the complainant has been allowed a credit, differ from than for which it has been refused. The first was delivered to the pursers of the ships and has been consumed by their crews; the other has been delivered to their agent authorised to procure supplies for the navy, and has been by him distributed to the ships, or is still retained by him as the property of the United States. If he was not authorised to receive it, let him answer for it. It is enough for the complainant that he did receive it, and has receipted for it as the agent of the United States, and on their behalf. Suppose we should consider that the complainant was not warranted as a navy agent to make the purchase from Mr. M'Culloch for the United States. The consequence is, that it was his own property, and by him sold and delivered to Mr. White, who was the agent of the government. Is it any answer to the seller of an article to such an agent, to tell him that, by the navy regulations, the pursers and not the navy agents are to furnish tobacco to our ships, and therefore the United States may keep and use the article but are not bound to pay for it? This cannot be. If the tobacco was received from the complainant as public stores, then he has a right to charge for it the price he gave for it; if it was a sale by him to the public agent, then he has a right to receive its fair price or value for it, and we have no better way of ascertaining it than by taking the actual cost of it to him. I cannot deny that a suspicion hangs upon my mind, that the sale to Mr. M'Culloch was not a real transaction, but a contrivance to enable Mr. Armstrong to sell his tobacco to the United States at an advance or profit on its cost, which, as a public agent, he was not authorised to do. If this were clearly shown, it would have no effect on the case other than to deprive him of the profit, a few cents a pound, and compel him to pass it to the United States at its first cost in Virginia, and the charges of taking it to Lima. The evidence is not sufficiently explicit on this point, to enable me to take this ground; and the objection has not been made at the treasury, from which, I presume they were satisfied in relation to it. I have, therefore, allowed the credit for the sum claimed in the complainant's account.

Decree: This cause coming on for final decision upon the bill, answer, replication, exhibits, depositions and other evidence: It is ordered, decreed and adjudged that the injunction heretofore granted in this cause, be and the same is hereby perpetuated, for and as to the sum of five thousand six hundred and twenty dollars and fifty-six cents, part of the sum or charge of twelve thousand eight hundred and seventy-five dollars and forty-four cents claimed by the defendants of and from the complainant, and for the recovery of which the warrant of distress in the bill mentioned was issued; and that the said defendants be and they are hereby perpetually enjoined from proceeding further against the complainant upon the said warrant of distress, for or on account of any claim or demand of and for the said sum of five thousand six hundred and twenty dollars and fifty-six cents. And it is further ordered, decreed, and adjudged, that the said injunction be dissolved, and it is hereby dissolved, for and as to the sum of seven thousand two hundred and fifty-four dollars and eighty-eight cents, the balance or remaining part of the said sum or charge of twelve thousand eight hundred and seventy-five dollars and forty-four cents, for the recovery of which the said warrant of distress was issued.

The following statement, to be filed with the decree, having reference to the account

or claim of credits which accompanies the bill of the complainant, exhibits the items of that account which have been allowed and disallowed to him, in making the above decree.

He has been allowed

| | | |
|---|---:|---:|
| A commission of one per cent on stores distributed | $ 208 | 80 |
| Clerk hire | 268 | 75 |
| Damages on protested bills | 863 | 33 |
| For tobacco delivered to the United States navy | 4,279 | 68 |
| | 5,620 | 56 |

He has not been allowed

| | | |
|---|---:|---:|
| Commissions rejected at the last settlement | $ 5,755 | 86 |
| His board while detained at Lima | 1,609 | 87 |
| Compensation for the same time | 3,229 | 15 |
| The two items for distribution of stores together | 1,043 | 99 |
| His passage home | 350 | 00 |
| Traveling to Washington, two items | 43 | 50 |
| Commissions for stores handed over to Philo White | 183 | 24 |
| Commissions on $80, paid to Mr. Henderson | 4 | 00 |
| | $12,219 | 61 |